The cause afterwards came to a plenary hearing before Chancellor James, who after hearing the pleadings, evidence and arguments, delivered the following decree:
The hill in this case charges the defendant, with having fraudulently obtained the bill of sale of six slaves in dispute, which slaves the defendant recovered of complainant, by an action of trover against her individually.
The complainant alleges that her husband, John Crawford, when on a visit to his father, in Anson county North Carolina, in December 1800, signed his name to a blank piece of paper, intending that it should he filled up with a title to defendant of a certain tract of land, but that defendant filled or procured it to be .filled up with a bill of saleof the slaves in question.
In the answer, defendant has stated that he paid §> 1,000 to his son for the six slaves, and took the lull of *178 sale for them. And to refute that part of the bill which states that he was in distressed circumstances, and had taken the benefit of the insolvent debtors’ act, and was not able to raise so large a sum of money, he states, it is true he did take the benefit of said act, in the year 1793, but that since "that time, he has been able to reach a state of considerable affluence: declares himself to be worth $ 5,000 ; and to shew,it, makes a statement of the property of which he is possessed.
To support the answer, Titus Crawford, a son of the defendant has been sworn, and two witnesses, Chas. Strother and Matthew Stallions, have been examined in North Carolina.
Titus Crawford, the son, has most minutely and particularly related all the circumstances respecting the payment of the S 1,000 consideration money mentioned "in the bill of sale : Ho says, that it was drawn by his brother Richard some time previous to the signing ;-*■ that lie read it, and several of tho family did so likewise; — that his brother John signed it at the supper-table, and that the money was counted out upon the table, partly in silver and partly in paper. He also adds many other circumstances, which might either argue that his memory was uncommonly retentive, or that he has proved too much.
The witnesses Strother and .Stallions, have also stated, that they heard John Crawford, while on a visit at his father’s, say, that he had sold tho boy Sam, and negroes "Warner and others to his father for- $ 1,0»0
To contradict this testimony, the complainant has produced the evidence of Stephen Tompkins, the elder and the younger, and the depositions under four commissions.
Stephen Tompkins the younger, relates, that after-the death of John Crawford, he went into North Carolina to the house of tho defendant, and first related t® the father and family the news of his son’s death. That in the evening after, when tho trouble and confusion in the family had somewhat subsided, (he being the brother- *179 ra-Iaw of John. Crawford, and acquainted with ills' affairs,) Michael Crawford the elder, asked him, if John Crawford had made a will ?■ The witness answered he had not. Then, said the defendant, his negroes will be sold, and I am sure he never intended them to go out of his family. The defendant next told the witness, that he would advise complainant to administer, and to buy in the negroes, for she could not do without them ; and to fix it so that all the negroes- might be sold in a lump. The witness asked him, if he thought this would be treating the children with justice, and defendant answer-.ed in the affirmative. That witness staid at the house of defendant, from about three o’clock in the afternoon, till breakfast next morning, and never heard from the defendant a syllable about his claim to the negroes, or ok the bill of sale. That he afterwards rode thirty-two miles with Richard, the son, who, it is said, drew the' bill of sale, and was in his company three days, and yet he never1 mentioned the bill of sale.
Stephen Tompkins, the elder, stated that he was; Very intimate with John. Crawford, his son-in-law, who told him of all his affairs, and that he never informed him of this circumstance, so maternal, as being the sale of the whole of the negroes he possessed. That after the return of John Crawford from North Carolina, in Dec.. 1800, when it is stated he sold the negroes, he was about to fight a duel, and made a will, which witness saw, and he therein-disposed of his negroes to his family, except. Sam,, whom he had sold to one Giffith, after his return from North Carolina. This witness also states, that when the defendant came in from North Carolina, and a little while previous to Ms commencing a suit at law for the negroes, he told him, ho had a bill-of sale for them.Witness asked him, bow he came by it ? and defendant said, that bis son Dick told him, when his son John was in North Carolina, he gave the bill of sale to him, saying ho might die or get killed on the way home; and that he flushed his brother Dick to give the bill of sale to ins father, that he might, in such case, make over the property to his children. Witness asked him, if he intended *180 to do so ? and defendant answered that he did. Defcm (]ant ]xja(Se many professions of love for the family» spoke removing the body of his son to North Carolina, and endeavored to persuade his widow and children to rc-move there with him. Upon being cross examined, the witness stated, that Michael Crawford, the defendant, also told him,' that he had never seen the bill of sale, till after the death of his son John.
Upon being called a second time, Stephen Tompkins the younger, said, that he had never sued Grif-fiths for Sam, and at the conversation above mentioned with defendant at his house, his wife said, that she would advise that Sam should not be sold, as he was a fine boy, and the defendant assented to what she said, and mentioned nothing of his claim to Sam. That defendant told this witness, that being old, lie never would see lidgefield; that his going w ould be of no service, as witness could advise as well as he.
At the close of the testimony given by these two witnesses, the court asked defendant’s counsel, if he could impeach their testimony, but ho did not attempt it, and upon enquiry it was found, that this evidence is unimpeachable,
1 n answer to the interrogatories in the commissions, Henry Key stated, that he heard defendant say, “If his son’s widow, the complainant, would go into North Carolina, and settle on a tract of land his son died possessed of, he never would attempt to take one of the ne-groes from her, but as she would not, lie was determined to take every one.” This witness also stated, that before the trial at law, he asked Richard Crawford if the consideration money had been actually paid ; he replied that six hundred dollars had been paid; and that afterwards, on the trial, he was surprised to hear the said Richard Crawford,declare on oath, that he saw his father pay his brother g 1,000 in silver.
Lewis Dickson deposes, that Michael Crawford the younger, told him, that either he, or his father, (witness is uncertain which) had possession of a blank pa-nor. signed hv duhn Crawford, which they intended i-> *181 nil up as a bill of sale of the negroes, to secure them to the children of John Crawford.
Robert Troy, attorney at law, testified, that it has been generally reported, and he understands and believes, that what property Michael Crawford, the defendant, lias in his possession, is covered by the claims of either Ills sons, or sons-in-law, and that he has obtained a judgmeut against him, amount not recollected, at the suit of Cbrsnut and others, which remains unsatisfied.
Philip Gathings has sworn, that about the year 1800, M. Crawford, the defendant, told him, all the property he then possessed, belonged to Ellerbia ; that Ellerbia left it there for him to live upon, and that he was worth nothing. And witness also states, that defendant is a crafty, tricky person.
William Cash says, from common report, the defendant is a poor man and a tricky one, and that he would not trust him.
Charles Vivion swears, that about three or four years before the death of John Crawford, he saw Michael Crawford, jr. have in his possession a blank piece of paper, with the name of John Crawford signed to it.
Having stated so much of the evidence as appeared necessary, we will proceed to remark upon it, and to draw such conclusions from it as appears to be equitable.
The first thing that must strike even an inattentive observer, is the very positive nature of the evidence offered by the defendant. In his answer, not content with denying the allegations, which were material, he has contradicted all parts of the bill, both material and immaterial. Every thing is recollected — every tiling is positive. But unfortunately for him, he has in one instance gone too far. He lias stated himself to be a máu in affluent circumstances, when all Ms neighbors who have been examined, declare the contrary -. and one of them in particular, Mr. Gathings, has sworn, that defendant fold him, that all the property he was possessed of, belonged to Ellerbia; and that be was worth nothing. When, therefore, he is found to deviate so much from the truth, in one part of the answer, 1 cannot bring "i:"d to absent to the truth of it in any other rwH.
*182 His son Titus also, appears after such a lapse of time to have proved too much. He states every thing* that happened, and comes forward into court, with such a bold confidence, repeats his evidence without'the least stop or hesitation, and goes on so directly in a straight line, that it appeared he had often conned it over as a lesson. The memories of Strother and Stallions also,, appear to he remarkable after eight or ten years. They can recollect not only the exact sum of money, but also-the names of the negroes, (and one of them a very [ unusual name,) which John Crawford said he had sold to his father. If these negroes had been known in North. Carolina, it would not have appeared so extraordinary;, but it seems they were not. I cannot help thinking the whole a confederacy, to deprive this woman and her children of their right, and I am of opinion that Richard and Michael Crawford, jun. have been actually proved to be confederates. A blank paper signed by John Crawford^ was seen in possession of the latter, and the former declared to his father that his brother had given it to him, in case of accident, to secure his property to hi's children. Indeed, the former also stated,, that it was intended to make the same use of the blank paper. If old Crawford had a positive bill of sale of these negroes, it is hardly to be presumed, that he would have told Stephen Tompkins, jr. to advise the widow to set them up for sale in a lump, and to buy them all in herself. Upon being asked by the witness, if this would be acting fairly towards the children, he answered in the affirmative, Which circumstance., of itself, goes to shew, that he must be the crafty and tricky man, he is represented by his neighbors to be. During all this time, lie speaks of the negroes as belonging to the estate of his Son, which shews, either that the bill of sale was an after-thought, or that it was delivered by John Crawford to his brother Richard for the purposes that defendant first stated to Stephen Tompkins, the elder. It will he unnecessary again to repeat the evidence of the elder Tompkins ; the declarations of defendant to him, seem to he at considerable variance with his positive and indi-• *183 vidual claim to the negroes, set forth in the answer, and they afford such a strong ground in favor, of the children, and such strong presumption' of fraud against the grandfather,* that in my opinion equity will never lend its aid to him in obtaining the negroes. At law it may have been necessary to bring the action against complainant in her individual capacity $ but the rights of administrators and of minors, will not be precluded by such-short-hand proceedings at law. Upon the whole of this case, I think it attended with such strong presumption of fraud, that I cannot lend the assistance of this court to ■the defendant. An injunction has been obtained against him, and it must stand, unless removed by a higher tribunal. Let bim take his bill of sale and make the most of it he can ; but let him pay the costs of the supple- ' xnentary bill.

 See the case of Elders and Tauiers, decided at the last coart of appeals at Columbia.